UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **LABORERS' INT'L UNION OF NORTH AMERICA, LOCAL 860,** | ) ) ) | CASE NO. 1:19CV2000 |
| | ) | SENIOR JUDGE |
| Plaintiff, | ) ) | CHRISTOPHER A. BOYKO |
| vs. | ) ) ) | |
| **KOKOSING CONSTRUCTION COMPANY, INC.,** | ) ) ) | OPINION AND ORDER |
| Defendant. | ) | |

**CHRISTOPHER A. BOYKO, SR. J.:**

Plaintiff Laborers' International Union of North America, Local 860 ("Local 860") and Defendant Kokosing Construction Company, Inc. ("KCC") both move for summary judgment arguing that their respective interpretation of a settlement agreement is correct and that the other party is in breach. The Court finds that the correct interpretation of the settlement agreement is a mix of the parties' arguments.

However, the Court does find that KCC breached the settlement agreement. Therefore, the Court **GRANTS, IN PART**, Local 860's Motion for Summary Judgment (Doc. 19) and **DENIES** KCC's Motion for Summary Judgment (Doc. 18). Since damages based on the Court's interpretation of the settlement agreement do not align with either parties' interpretation, the Court **DENIES AS MOOT** KCC's Motion to Strike the Declaration of Attorney Guarino (Doc. 25) and **ORDERS** the parties to submit a Joint Proposed Schedule moving forward by 12:00PM, October 6, 2021.

## I. BACKGROUND FACTS

Local 860 is the local affiliate of the Laborers' International Union of North America (the "Union"), which covers Cuyahoga, Lake and Geauga Counties, Ohio. KCC is a general contractor in the heavy-highway construction industry. Both Local 860 and KCC are signatories to the Heavy Highway Agreement, 2016-2019 (the "CBA"). The CBA governs the employment conditions between contractors and union members, including specific hiring ratios applicable to construction projects.

In June of 2016, the Ohio Department of Transportation awarded KCC the I-271 Project. "The I-271 Project involved the reconstruction of I-271 and I-480 where the two interstates came together and separating them in an effort to reduce congestion in traffic." (Mesick Affidavit, Doc. 18-2, PageID: 214, ¶ 5). In August of 2016, KCC began work on the Project.

Roughly five months later, Local 860 informed KCC that it initiated three grievances for violations of the CBA's hiring protocols. Those grievances related to the I-271 Project, the I-480 Project and a Non-Bargaining Unit Grievance. One of the main contentions in the I-271 Project Grievance was whether KCC qualified as a Traveling Contractor or Local Contractor as defined by the CBA. Local 860 contended that KCC was a Traveling Contractor and thus required to hire more local Laborers than out-of-town Laborers.[1] For its part, KCC contended it qualified as a Local Contractor under the CBA.

The above grievances proceeded to arbitration in June of 2018. After an initial hearing, additional hearings were set and rescheduled. Ultimately, the parties rescheduled a final hearing for February of 2019.

---

[1] Local 860's counsel contextualized this hiring dispute during Arbitration as follows: if KCC employed 36 Laborer Employees, it would have to hire from Local 860's referral hall: 18 Laborer Employees if it was a Local Contractor; or 23 Laborer Employees if it was a Traveling Contractor. (*See* Doc. 19-24, PageID: 5508-09).

In the week leading to the hearing, the parties engaged in settlement discussions. Anthony Liberatore negotiated on Local 860's behalf, while Wm. Brett Burgett represented KCC. The parties ultimately came to a resolution of all three grievances and on February 11, 2019, executed their Settlement Agreement (the "Agreement").

With their Agreement, the parties amended the hiring procedures set forth in the CBA. Specifically, the Agreement contains the following key paragraphs:

> 3. For the 2019 construction season, for each project in Local 860's jurisdiction, KCC shall employ Laborer Employees using the following procedure: except for I-271 Project (ODOT 160218), no less than 50% of KCC's Laborer Employees on each project shall be hired through Local 860's referral hall or shall be members of Local 860. For the I-271 Project during the 2019 construction season, all of KCC's new Laborer Employee hires will be hired through Local 860's referral hall. KCC shall transfer out of town Laborers working on the I-271 Project to projects closer to their home locals as soon as reasonably practicable.
>
> 4. For the 2020 construction season and beyond, for each project in Local 860's jurisdiction, KCC shall employ Laborer Employees using the following procedure: no less than 50% of the Laborer Employees on each project shall be hired through Local 860's referral hall or shall be members of Local 860.
>
> 5. This Agreement is being made on a non-precedential basis with respect [to] any person or entity other than the Parties. Moreover, notwithstanding anything in this Agreement to the contrary, if the hiring ratios or definition of local contractor in Paragraphs 19 or 20 are modified in any future statewide Heavy Highway or other agreement, either Party, at its option, shall no longer be bound by this Agreement.

(Doc. 19-29, PageID: 5852). At the time of the Agreement, the I-271 Project had been underway for two-and-a-half years. During that time, KCC hired approximately 119 Laborer Employees. Of those employees, 71 were out-of-town Laborer Employees. Accordingly, there was a ratio of roughly 60% out-of-town Laborer Employees to 40% Local 860 Laborer Employees.

Local 860 alleges that "immediately after the execution of the Settlement Agreement," KCC violated the Agreement by hiring additional out-of-town Laborers onto the Project. (Liberatore Affidavit, Doc. 19-27, PageID: 5763, ¶ 21). KCC disagreed. This disagreement caused KCC to file a complaint for Declaratory Relief with this Court on March 1, 2019. (*See* Case No. 1:19CV467). However, on August 14, 2019, the Court dismissed the initial Complaint without prejudice for want of jurisdiction. (Doc. 17, Case No. 1:19CV467).

After swapping parties, Local 860 filed the instant Complaint on August 30, 2019, alleging KCC breached the Agreement in three ways, discussed more below. (Doc. 1). KCC filed an Answer and Counterclaim on October 7, 2019, alleging that Local 860 actually breached the Agreement by unlawfully imposing additional obligations not contained in the Agreement on KCC. (Doc. 5).

On September 25, 2020, the parties filed cross-Motions for Summary Judgment. (Docs. 18 & 19). Each party opposed. (Doc. 24 & 25). In its Opposition, KCC also moved to strike an affidavit supporting Local 860's Motion for Summary Judgment. (Doc. 25). Local 860 opposed the Motion to Strike (Doc. 26), which prompted KCC's Reply in Support (Doc. 27). Believing that the Reply put forth new arguments and new requests for relief, Local 860 requested leave to file a Sur-Reply and attached a Sur-Reply brief therein. (Doc. 28).

## II. PROCEDURAL MOTIONS

Some housekeeping is necessary before proceeding to the merits of the dispute. First, both parties moved for leave to exceed the page limits in their Opposition. These requests occurred before the Christmas holiday in 2020 and the Court granted the requests via electronic communications with counsel. However, the Court's permission never reached the docket.

Therefore, the Court **GRANTS** each parties' request to exceed the page limits in their Oppositions. (Docs. 22 & 23).

In briefing the Motion to Strike, Local 860 argues that KCC included a new ground for relief in a footnote in the Reply. Accordingly, Local 860 requested leave to file a Sur-Reply to address that new ground. The Court agrees with Local 860's characterization of the footnote and **GRANTS** Local 860's Motion for Leave (Doc. 28). The Court deems the Sur-Reply filed as of January 26, 2021. (*See* Doc. 28-1).

### III. LAW & ANALYSIS

**A.     Standard of Review**

Summary judgment shall be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). The moving party must either point to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). A court considering a motion for summary judgment must view the facts and all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward

with some significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324; *Lansing Dairy*, 39 F.3d at 1347.

This Court does not have the responsibility to search the record *sua sponte* for genuine issues of material fact. *Betkerur v. Aultmamn Hosp. Ass'n.*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp Tr.*, 980 F.2d 399, 404-06 (6th Cir. 1992). The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986), and if the nonmoving party fails to make the necessary showing on an element upon which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

The appropriateness of summary judgment depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distrib. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

Plaintiff understands the Agreement to set forth the following hiring procedure: KCC must (i) transfer all out-of-town Laborers off the Project. That means every out-of-town Laborer; (ii) replace those transferred Laborers with Laborers hired from Local 860's referral hall; and (iii) refrain from bringing in additional out-of-town Laborers to work on the Project after the date of the Agreement.

**B.   General Principles of Contract Interpretation**

District courts may enforce settlement agreements between parties to a collective bargaining unit under § 301 of the Labor Management Relations Act. *See Retail Clerks Intern. Ass'n, Local Unions Nos. 128 & 633 v. Lion Dry Goods, Inc.*, 369 U.S. 17, 28 (1962); *Jones v. General Motors Corp.*, 939 F.2d 380, 382-83 (6th Cir. 1991). In doing so, courts apply federal

common law with the goal to elucidate the parties' intentions. *Textile Workers Union of America v. Lincoln Mills of Ala.*, 353 U.S. 448, 456 (1957); *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015); *In re AmTrust Fin. Corp.*, 694 F.3d 741, 749 (6th Cir. 2012). The best way to determine the parties' intentions is to apply the traditional methods of contract interpretation. *AmTrust Fin.*, 694 F.3d at 749-50.

In applying these traditional methods, courts start with the written instrument itself. *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1374 (6th Cir. 1994); *Gallo v. Moen Inc.*, 813 F.3d 265, 273 (6th Cir. 2016) ("The first and best way to divine the intent of the parties is from the four corners of their contract and from traditional canons of contract interpretation"). In reviewing the written agreement, courts must interpret the provisions "according to their plain meaning, in an ordinary and popular sense." *Perez v. Aetna Life Ins.*, 150 F.3d 550, 556 (6th Cir. 1998). When that plain "meaning is clear on its face, that meaning controls." *AmTrust Financial*, 694 F.3d at 750.

However, if that plain meaning is subject to two reasonable interpretations, then that provision is ambiguous. *Wulf*, 26 F.3d at 1376. The question of whether language "is ambiguous is a question of law that may be resolved summarily." *Int'l Union, United Mine Workers v. Apogee Coal*, 330 F.3d 740, 744 (6th Cir. 2003) (citations omitted). If the court finds ambiguity, it may consider extrinsic evidence, *Wulf*, 26 F.3d at 1376, including relevant extrinsic evidence of the parties' intent and the meaning of the words that they used. *CITGO Asphalt Refining Co. v. Frescati Shipping Co., Ltd.*, 140 S. Ct. 1081, 1088 (2020). But again, two competing *reasonable interpretations* are necessary before a court finds ambiguity. *See Perez*, 150 F.3d at 557.

C.    **Definitions of Laborer Employee and Laborer**

Before moving to the contractual obligations at issue, a threshold issue exists of who qualifies as a "Laborer Employee" under the Agreement.  The Agreement does not define the term.  Plaintiff argues that the term Laborer Employee includes every employee working for KCC that is represented by the Union, including supervisory personnel.  Defendant disagrees, arguing that the Court should focus on the capitalization of the term and refer to the definition of Employee in the CBA.  When doing so, the term clearly excludes supervisory personnel.

At the outset, Paragraph 3 contains two different terms: "Laborer Employee" and "Laborer."  While neither party clearly addresses this distinction, the use of two different terms is meaningful.  *See Gallo*, 813 F.3d at 270 (a "difference in language demands a difference in meaning").  Reading these two different terms to mean the same thing would render either term superfluous, which courts avoid.  *See AmTrust Financial*, 694 F.3d at 753.

To define each term, the Court refers to the CBA.  In resolving the grievances, the Agreement modified one specific aspect of the CBA — the hiring procedures found in Article II, Paragraphs 19 and 20.  In their Agreement, the parties specifically reserved the right to withdraw from the Agreement should CBA paragraphs 19 and 20 be modified.  (Doc. 19-29, PageID: 5852, ¶ 5).  Accordingly, even though the resolution of the underlying obligations does not directly involve the CBA, reference to the CBA is proper because the CBA still governs the parties' underlying relationship.  *See Jones*, 939 F.2d at 382-83.

Turning then to the CBA, the Court easily finds the definition of "Laborer Employee" in Article II, Paragraph 13.  The provision defines "Employees" to:

> Not include professional engineering personnel, clerical employees, time-keepers, superintendents, assistant superintendents, nor any supervisory personnel, but shall include all other persons employed by the Contractors in the performance of any of the various classes

> of work covered by this Agreement, coming within the jurisdiction of the Union as set forth in Exhibit A, excepting where a Contractor finds that he needs an exclusive Laborer foreman.

(Doc. 19-28, PageID: 5781, ¶ 13).  Thus, "Laborer Employee" does not include supervisory personnel.

While the CBA does not define "Laborer," the last clause in the above definition provides the Court guidance of Laborer's meaning.  That definition is more expansive than the term Laborer Employee.  (*See* Doc. 19-28, PageID: 5820, Exhibit B to the CBA: "if, in the opinion of the Contractor, a foreman is necessary to direct and supervise Laborers working within their jurisdiction, the foreman shall be a Laborer").  Thus, the Court finds that the term Laborer includes supervisory personnel.

Accordingly, the Court sets for the following definitions of the terms "Laborer Employee" and "Laborer":

> "Laborer Employee" means all persons employed by the Contractor in the performance of the various classes of work covered by the CBA, except for professional engineering personnel, clerical employees, time-keepers, superintendents, assistant superintendents, and supervisory personnel; and

> "Laborer" means all persons employed by the Contractor that are represented by the Union, including supervisory personnel.

**D.     KCC's Obligation to Transfer Laborers**

While not the first obligation listed in Paragraph 3 of the Agreement, the Court believes it necessary to address the transfer obligation at the outset.  The Agreement requires KCC to "transfer out of town Laborers working on the I271 Project to projects closer to their home locals as soon as reasonably practicable."  (Doc. 19-29, PageID: 5852, ¶ 3).  And, as set forth above, this obligation applies to Laborers, the more expansive definition that includes supervisory personnel.

Both parties agree that this transfer obligation is contingent on the availability of a project closer to the out-of-town Laborer's home local. From there, the parties' interpretation differs. This difference comes down to two disputes: i) the timing of transfers; and ii) the number of Laborers KCC must transfer off the Project.

*i.  Timing of Transfers – "As Soon As Reasonably Practicable"*

Local 860 interprets "as soon as reasonably practicable" to impose a 30-day deadline based on caselaw and certain federal regulations. KCC disagrees, arguing that the phrase encompasses more consideration than a date certain. According to KCC, many considerations go into the decision to transfer, including: is there a project available closer to the home local? Does that project have a position available for the transferred Laborer? Even if yes to both questions, can KCC afford to transfer this individual Laborer off the Project at this time? How would this Laborer's transfer impact the timing of the Project?

The Court finds that "as soon as reasonably practicable" depends on many factors, like the ones KCC cites. The authority that Local 860 cites related to securities disclosure obligations and requests for leave under the Family and Medical Leave Act are inapposite. Both situations involve providing simple notice based on a triggering event, not the transfer of multiple individuals from one construction project to another.

Moreover, the caselaw concerning the contractual defense of impracticability is not at issue here. KCC does not defend its actions because it was impractical to transfer Laborers. Indeed, KCC was actively transferring Laborers throughout 2019. KCC's defense is more a rebuttal to Local 860's onerous timing requirement.

One of Local 860's cites, however, does provide guidance. In *Nat'l Wildlife Fed'n v. Norton*, specifically footnote 12, the court looked to the Federal Highway Administration's

definition of "practicable" for guidance. 306 F. Supp. 2d 920, 927 n. 12 (E.D. Cal. 2004). That administration — which is more relevant here than the Department of Labor given the context of the construction project at issue — defines practicable to mean: "capable of being done with reasonable natural, social or economic constraints." 23 C.F.R. § 650.105(k). These "natural, social or economic constraints" encompass the many factors KCC cited in its understanding of the Agreement.

Thus, the Court finds that KCC is correct in considering the "natural, social and economic constraints" of transferring Laborers off the Project to other projects closer to their home locals. The Agreement does not require KCC to transfer Laborers off the Project by a date certain. Rather, KCC must act "as soon as reasonably practicable," which affords KCC discretion.

  ii. *Number of Laborers Transferred*

For number of Laborers, Local 860 believes KCC is required to transfer all out-of-town Laborers off the Project, i.e., not a single out-of-town Laborer may remain on the Project in 2019. Again, KCC disagrees, arguing that it did not commit to transfer a certain number of out-of-town Laborers off the Project, and it certainly did not commit to transfer all out-of-town Laborers off the Project. Instead, KCC argues that the Court should look at Paragraph 4 of the Agreement for any number requirement.

The Court finds that the Agreement does not require KCC to transfer every out-of-town Laborer off the Project for four reasons. First, the provision does not state that KCC must transfer *every* out-of-town Laborer off the Project. If the parties intended that result, they would have contracted for that.

Second, the surrounding paragraphs also lead to the same conclusion.  Courts must construe the text as a whole, giving "effect to all its provisions and to render them consistent with each other."  *Gallo*, 813 F.3d at 270; *see also Florida Canada Corp. v. Union Carbide & Carbon Corp.*, 280 F.2d 193, 195-96 (6th Cir. 1960) ("A contract cannot be disjointed or particular parts separated from the balance, as it is necessary to consider all of the provisions of a contract in order to determine the meaning of any particular part as well as the meaning of the whole document").  The first portion of Paragraph 3 imposes a 50% ratio on KCC to employ Laborer Employees on all other projects than the I-271 Project.  Paragraph 4 then imposes the same 50-50 ratio on all projects (including the I-271 Project) in 2020.  This shows that the parties certainly knew how to impose number requirements on KCC's employment practices.  Again, if the parties desired KCC to transfer 100% of Laborers off the Project, they could have specifically agreed to that.

Third, the context of the dispute further supports the finding that KCC did not need to transfer all Laborers off the Project.  Remember, this Agreement came to fruition to resolve a grievance that KCC employed too many out-of-town Laborers and not enough local Laborers under the CBA.  But even under the strictest interpretation of the CBA, contractors are never required to employ 100% local Laborers to support their projects.

Finally, Local 860's position would produce an absurd result.  Courts readily read contract provisions to produce plausible results.  *Cassidy v. Akzo Nobel Salt, Inc.*, 308 F.3d 613, 618 (6th Cir. 2002), and Local 860's reading is implausible.  As mentioned, the Agreement specifically allows KCC to have out-of-town Laborers on the Project in 2020.  Transferring every out-of-town Laborer off the Project just to rehire them back in 2020 defies common sense.

Accordingly, the Court will not enforce Local 860's unreasonable interpretation of the transfer obligation.

       *iii.       Transfer Obligation and Summary Judgment*

Thus, the Court holds that the transfer obligation is more in line with KCC's interpretation of the Agreement. But this does not mean KCC is in the clear. While KCC does not have to transfer every Laborer off the Project, that does not mean KCC could wait until the end of 2019 in order to satisfy the 50-50 requirement for 2020. To the contrary, KCC must transfer those Laborers off the Project "as soon as reasonably practicable."

KCC repeatedly references the 39 Laborers it transferred off the Project in 2019. While that is true, most of those transfers came in November and December of 2019, when the Project was presumably wrapping up for the Winter. Moreover, of those 39 Laborers, many were out-of-town Laborers that KCC brought onto the Project after the date of the Agreement, which is problematic for the reasons discussed below. Finally, Local 860 highlights various projects that could have accepted out-of-town Laborers from the Project. To rebut these arguments, KCC relies on the arguments of counsel, with no factual averments to support them. (*See* Doc. 25, PageID: 48220-21).

Thus, material facts remain in dispute as to whether KCC complied with its obligation to transfer out-of-town Laborers off the Project as soon as reasonably practicable.

**E.    KCC's Obligation to Hire Laborer Employees**

Next, the Agreement requires that, "[f]or the I271 Project during the 2019 construction season, all of KCC's new Laborer Employee hires will be hired through Local 860's referral hall." (Doc. 19-29, PageID: 5852, ¶ 3).

Local 860 argues this provision imposes dual obligations on KCC. First, KCC must replace those transferred out-of-town Laborers with Local 860 members. And second, KCC must refrain from staffing the Project with out-of-town Laborer Employees, i.e., KCC may not transfer out-of-town Laborer Employees to the Project after the date of the Agreement.

KCC disagrees with this interpretation. First, KCC argues it has discretion and is not required to replace those transferred Laborers with Local 860 referrals. Second, KCC argues that the word "new" is important and applies only to those "new" hires to KCC. Thus, KCC is not prohibited from recalling employees whom it previously hired, even if they are out-of-town Laborer Employees.

As an initial matter, the Court agrees with KCC that this obligation does not impose the positive requirement that KCC replace each transferred Laborer with a Local 860 Laborer Employee. Indeed, if KCC desired to leave those transferred positions open, it could do that. Again, KCC has certain economic constraints that it may consider when making hiring decisions. (*See also*, the CBA, Doc. 19-28, PageID: 5782, ¶ 14: "the Contractor shall be free to select the employees whom he desires to employ, subject to the terms of the [CBA]."). However, once KCC decided to staff the Project after the date of the Agreement, this obligation becomes important. Ultimately, the Court disagrees with KCC and finds that this provision applies to Laborer Employees new to the Project rather than new to KCC.

Start with the language of the provision itself. The clause "For the I-271 Project during the 2019 construction season" modifies KCC's new hires. It contextualizes the requirement, as well as restricts the requirement specifically to the Project. Because of that, any new hire must come through Local 860's referral hall.

KCC's own understanding of 'hire' further supports this construction. In its briefing, KCC indicated that it "***hired*** approximately 119 Laborer Employees to perform work on the Project." (Doc. 18, PageID: 191; Doc. 25, PageID: 48200) (emphasis added). Of these 119 Laborer Employees, many previously worked for KCC. In briefing then, KCC refers to a hiring decision to the Project and not to the company.

Noticeably absent from the Agreement is the ability to recall Laborer Employees who previously worked for KCC. To circumvent this, KCC argues that the Agreement did not alter the CBA provision allowing it to recall employees. But KCC is wrong. In fact, that is exactly what the Agreement did—modify Paragraphs 19 and 20 of the CBA to set forth a new hiring procedure for the projects identified in the Agreement. The ability to recall that KCC relies on is contained within Paragraphs 19 and 20, which again, were modified by the Agreement. Similar to the transfer obligation above, the Court will not read into the Agreement the ability to recall as KCC wants.

Even if the Court were to find KCC's interpretation of this provision reasonable and thus find the provision ambiguous, the contemporaneous evidence further supports the Court's finding. While each party presents their own interpretation of the clause,[2] the Court finds that the best evidence is contained within the parties' negotiations leading to the Agreement. There, the Court finds that KCC attempted to add the ability to recall employees into the Agreement. (Doc. 19-31, PageID: 5859).[3] Local 860 struck that ability. (Doc. 19-32, PageID: 5862, stating that "[y]our view that you can staff a project with any person Kokosing has hired in the last year

---

[2] Liberatore Affidavit, Doc. 19-27, PageID: 5763, ¶ 23; Burgett Affidavit, Doc. 25-11, PageID: 48362, ¶¶ 14, 15.

[3] KCC attempted to add the following ability: "KCC can recall any (1 or more; not limited to 1) Laborer Union member in good standing, who has worked for KCC during the past year; and if KCC thereafter needs additional help, KCC will obtain at least 50% of such additional employees through Local 860." (Doc. 19-31, PageID: 5859).

without regard to any ratio does not make any sense to us"). KCC agreed and ultimately, the final Agreement did not contain the recall ability that KCC now claims exists.

Accordingly, both the plain language of the Agreement and the evidence of the parties' negotiations support the Court's finding that KCC could not recall out-of-town Laborer Employees to staff the Project after the date of the Agreement. Since it is undisputed that KCC hired out-of-town Laborer Employees to the Project after the date of the Agreement, the Court holds that KCC breached the Agreement.

**F.      KCC's Motion for Summary Judgment**

In its Counterclaim, KCC asserts Local 860 breached the Agreement by imposing additional obligations not contained in the Agreement on KCC. KCC moved for summary judgment on this claim (Doc. 18) and Local 860 opposed (Doc. 24).

A necessary requirement for a breach of contract claim is that the party alleging a breach performed its obligations under the contract. *See Georgetown of the Highlands Condominium Owners' Assoc. v. Nsong*, 113 N.E.3d 192, 201 (Ohio Ct. App. 2018). KCC cannot satisfy this requirement. As the Court held above, KCC breached the Agreement by hiring out-of-town Laborer Employees onto the Project after the date of the Agreement. The Court thus agreed with Local 860's interpretation in that regard. Therefore, the Court does not find that Local 860 was trying to impose additional obligations onto KCC. Even under KCC's misguided interpretation of the clause, the Court finds it still breached the Agreement.[4]

Since KCC cannot show it performed its obligations under the Agreement, the Court **DENIES** KCC's Motion for Summary Judgment. (Doc. 18).

---

[4] *See* Doc. 18-8, KCC's transferred Laborer Employee list, which sets forth the original hire date of KCC's Laborer Employees. Specifically, KCC hired three out-of-town Laborer Employees (Travis Brown, James Jarrell and Travis Sims) for the first time in 2019 and assigned them to work on the I-271 Project. Thus, even under KCC's understanding of its obligations, it still violated the Agreement.

**G.** **Motion to Strike**

In its Opposition to Summary Judgment, KCC moved to strike the Declaration of Attorney Guarino. (*See* Doc. 25, PageID: 48225). According to KCC, Guarino's Declaration should be stricken because it asserts conclusions of law and ultimate facts for which he had no personal knowledge. Attorney Guarino opposed the motion, arguing that his Declaration is proper because it sets forth Local 860's understanding of the Agreement and is merely provides a damages calculation. (Doc. 26). In its Reply, KCC argues that this is improper and that the Declaration does not comply with Rule 56. Moreover, with his Declaration, Attorney Guarino improperly inserts himself as a fact witness, violating ethical rules for attorneys. (Doc. 27). Guarino filed a Sur-Reply contesting this accusation and finding it improper that KCC is moving to disqualify him as counsel for Local 860. (Doc. 28-1).

While the Court understands KCC's objection to Guarino's Declaration, the Court need not address the dispute at this time. As mentioned, Guarino's Declaration is relevant for calculating damages according to Local 860's understanding of the Agreement. Since that understanding is incorrect in part, Guarino's damage calculation is unhelpful at this juncture. Therefore, the Court **DENIES AS MOOT** KCC's request to strike. (Doc. 25).

## IV. CONCLUSION

The Agreement reflects the parties' attempt to refine KCC's hiring obligations of Local 860 members. While certain material facts remain in dispute, the Agreement's plain meaning does make it clear that KCC breached the Agreement.

Accordingly, the Court **GRANTS, IN PART**, Local 860's Motion for Summary Judgment (Doc. 19); **DENIES** KCC's Motion for Summary Judgment (Doc. 18); and **DENIES AS MOOT** KCC's Motion to Strike (Doc. 25).

**IT IS SO ORDERED.**

 s/ Christopher A. Boyko
**CHRISTOPHER A. BOYKO**
**Senior United States District Judge**

**Dated: September 30, 2021**